IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| RON BEHAR, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. CIV-07-179-C |
| | ) | |
| CERTAIN UNDERWRITERS AT | ) | |
| LLOYDS, LONDON and | ) | |
| INTERNATIONAL SPECIAL EVENTS | ) | |
| AND RECREATION ASSOCIATION, | ) | |
| INC., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION & ORDER

In this action, Plaintiffs Ron and Danielle Behar and their business entity, through their bankruptcy trustee, assert breach of contract and bad faith claims against their purported commercial liability insurer.[1]  Both sides have moved for summary judgment.  For the reasons set out below, the Court holds that summary judgment is appropriate because no dispute of material fact exists as to whether Plaintiffs were insured for purposes of the liability claim at issue.

### STANDARD

Summary judgment is proper only if the moving party shows "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter

---

[1] Plaintiffs originally sued Defendant "Underwriters at Lloyds, London d/b/a International Special Events and Recreation, Inc."  Lloyds and International Special Events and Recreation Association Inc. ("IRESA") have long disputed that they are so related, claiming to be distinct and separate entities.  Plaintiffs were recently granted leave to amend their complaint to identify two separate defendants.  They are treated accordingly herein.

of law." Fed. R. Civ. P. 56(c).  "An issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim."  See Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 670 (10th Cir. 1998).  "An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."  Id.  If the movant carries the initial burden of demonstrating the absence of material fact requiring judgment as a matter of law, the nonmovant must then set forth "specific facts" outside the pleadings and admissible into evidence which could convince a rational trier of fact to find for the nonmovant.  Fed. R. Civ. P. 56(e).  When deciding whether summary judgment is appropriate, the Court views the evidence in the light most favorable to the nonmoving party and draws all reasonable inferences in that party's favor.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Simms v. Okla. ex rel. Dep't of Mental Health, 165 F.3d 1321, 1326 (10th Cir. 1999).  At the summary judgment stage, the Court's function is not to weigh the evidence but to determine whether there is a genuine issue for trial.  Willis v. Midland Risk Ins. Co., 42 F.3d 607, 611 (10th Cir. 1994).

With respect to cross-motions for summary judgment, the Court must evaluate each motion on its own merits, construing all inferences in favor of the party against whom the motion under consideration is made.  See Pirkheim v. First Unum Life Ins., 229 F.3d 1008, 1010 (10th Cir. 2000).  Although summary judgment is inappropriate if disputes remain as to material facts, the Court is permitted "'to assume that no evidence needs to be considered other than that filed by the parties.'"  Atl. Richfield Co. v. Farm Credit Bank of Wichita, 226 F.3d 1138, 1148 (10th Cir. 2000) (citations omitted).

2

**BACKGROUND**

Bill and Betty Rutz owned and operated the Sun 'N Fun Waterpark in Ponca City, Oklahoma, through their business Sun 'N Fun Family Recreation Inc. ("Recreation Inc."), for approximately 26 years.  In 2005, they agreed to sell the park assets to a young couple, Ron and Danielle Behar.  The Behars formed Sun 'N Fun Waterpark, L.L.C. ("L.L.C.") to receive the Recreation Inc. assets.  Included in the intent to purchase documents, Ron Behar promised to operate the water park "as though it were a stock purchase," including continuing the same checking account and assuming responsibility for all accounts payable and receivable.  (Defs.' Ex. 3, ¶ 2.)  Behar also memorialized a mutual promise to work to change the names authorized on charge accounts but to leave those accounts in place.  (Id., ¶ 3.)  A note by an official of the bank financing the purchase states that "They [the Behars/L.L.C.] are actually going to assume the current Sun N Fun [Recreation Inc.] Policy."  (Pls.' Resp. Ex. 11.)  According to Ron Behar, he had discussed with Betty Rutz the idea of getting the commercial liability policy transferred, was aware that she was getting a new policy at the end of June 2005, and was told by Bill Rutz that policy premiums would likely be higher because the Behars had never managed a water park.  (Ron Behar Dep. at 80-81.)

The commercial liability policy covering the water park and issued in Recreation Inc.'s name was to expire on June 25, 2005.  ISERA holds itself out to be a "Risk Retention 'Purchasing Group' filed under the Risk Retention Act of 1986 - Public Law 97-45."  (Pls.' Resp. Ex. 18, Participating Member Declaration Certificate.)  It apparently is an association

3

made up of recreation companies like the water park for the purpose of facilitating the acquisition of liability insurance for those member businesses.[2]

ISERA notified the Rutzes of the impending expiration of the liability policy and the availability of new coverage in a letter dated June 13, 2005.  Apparently, ISERA has negotiated some or all of the underwriting with Lloyds and offers its "participating members" commercial liability insurance under a master group policy.

In response to the June 13 notice, Betty Rutz returned all the required documents and payment to bind coverage on June 29, 2005.  (See Pls.' Resp. Exs. 5, 6, 13, 15 & 16.)  The Business Liability Quotation provided that it was offered in behalf of ISERA, identified Recreation, Inc. as the company to be insured, and included essential coverage terms.

Also, on June 29, the Rutzes and the Behars meet with Larry Buck of Eastman National Bank at the water park. (Pls.' Resp. Ex. 1, Kay County Order.)  A closing statement prepared by Buck was signed, as was an authorization to release funds, and a warranty deed was delivered.  Although the Behars subsequently claimed that the transaction had not closed

---

[2]  "Risk retention purchasing group" is not defined in the federal statute.  A "risk retention group" is a corporation or limited liability association "whose primary activity consists of assuming, and spreading all, or any portion, of the liability exposure of its group members."  15 U.S.C. § 3901(a)(4)(A).  It must be chartered or licensed as a liability insurance company under state law. Id. § 3901(a)(4)(C)(i).  A "purchasing group," in contrast, "has as one of its purposes the purchase of liability insurance on a group basis" "to cover their similar or related liability exposure."  Id. § 3901(a)(5)(A) & (B).

In a recent filing, Plaintiffs have asserted that ISERA "is a risk retention group domiciled in Utah that procures insurance for its membership.  It also performs underwriting and other functions for" Lloyds.  (Dkt. No. 94, ¶ 5.)

and, if it had, attempted to rescind, an Oklahoma District Court in Kay County has since determined that the purchase of the water park closed and became final on June 29, 2005.[3]

On July 14, 2005, seventeen-year-old lifeguard, A.J. Bray, died as a result of injuries suffered during an after-hours employee party at the water park.  Bray was forced over the edge of the "Twister" waterslide and fell fifteen feet onto a fence and concrete walkway. Bray and others had been waiting downstream in the slide flue for the release of water being dammed at the entry pool exit so that they could "chain ride" down the slide.  (Pls.' Resp. Ex. 43.)  Bray was standing up in the slide when the rush of water, additional tubes, and one or more of the employees who had dammed the entry pool exit reached him and, ultimately, caused him to go over the edge of the slide.  (Id.)

The next day, Ron Behar, on behalf of L.L.C., requested in writing that the Rutzes and Recreation Inc. immediately notify their insurance carriers regarding Bray's death.  (Pls.' Resp. Ex. 19.)  Lloyds received a completed incident form no later than July 21.  (Pls.' Resp. Exs. 20 & 21.)  David McBride, a claims adjuster, spoke with Betty Rutz on July 22 and understood that the water park was "under new ownership (Ron and Danielle Behar)."  (Pls.' Resp. Ex. 23.)  On July 27, McBride apparently spoke with Ron Behar and, during that conversation, indicated that the Behars would not be covered because Recreation Inc.'s policy contained an anti-assignment clause.

---

[3]  That determination was made in a lawsuit concerning ownership of and the priority of competing security interests in the water park.  Judgment issued accordingly, and an appeal was later dismissed.

Meanwhile, before Bray's death and the ensuing discussions regarding coverage, a decision had been made to offer Recreation, Inc. commercial liability insurance based on the application submitted by Betty Rutz in late June.  On July 7, the policy was mailed to Recreation Inc.  (Pls.' Resp. Ex. 16.)  It was received by Betty Rutz on July 19, four days after Bray's death.  ISERA's Coverage Contract Receipt Form states, "You will not be insured unless we receive this form from you duly signed, dated, and witnessed, within 10 calendar days of receipt of your Coverage Contract."  (Pls.' Resp. Ex. 17.)  Betty Rutz executed the receipt form on behalf of Recreation, Inc. on July 29 and returned it.  (Id.) Recreation Inc.'s policy had a retroactive effective date of June 25.[4]

A financed premium payment on Recreation Inc.'s commercial liability policy was due July 25.  Ron Behar made that payment on August 1, out of the "Sun 'N Fun Waterpark" checking account.  (ISERA refunded that money in October 2005.  (Defs.' Resp. Ex. 7.))

On July 27, the Behars began the process of getting commercial liability insurance through ISERA for L.L.C.  L.L.C.'s policy became effective on August 3.

---

[4]  The policy states:

"Retroactive Date" means any date expressly identified on the Declarations Certificate as the Retroactive Date.  An expressly identified Retroactive Date shall be considered the Effective Date for determining the Coverage Contract Period.  If no Retroactive Date is expressly identified on the Declarations Certificate, no coverage is provided for any period of time before the Effective Date.

(Pls.' Resp. Ex. 18, Recreation Inc. Policy at 20.)   Recreation Inc.'s Participating Member Declaration Certificate identifies the "Coverage Effective Date" and the "Retroactive Date" as June 25, 2005.

In August 2006, the Bray family sued the Behars and the Rutzes personally and their business entities for wrongful death.  That suit settled.  Lloyds declined to defend the Rutzes but did participate in the settlement.  The Behars and L.L.C. instituted this action against Recreation Inc.'s commercial liability insurer based on the denial of coverage and refusal to defend and indemnify them against claims asserted in the Bray litigation.

DISCUSSION

Both sides have moved for summary judgment on the coverage issue.[5]  At the bottom of the dispute is whether the Behars and/or L.L.C. were entitled to defense/indemnity in the Bray suit.  Because A.J. Bray's death occurred before L.L.C. had a liability insurance policy in its own name, coverage existed, if at all, under Recreation Inc.'s policy.

Two preliminary issues must be dispensed with before proceeding to the substance of the coverage dispute.  The first involves a choice of law.  The second involves the effect to be given to the Kay County court's determination that the water park sale closed and became final on June 29.

### A.    Choice of Law

In making choice of law determinations in a diversity case, the Court must apply Oklahoma's choice of law rules.  Shearson Lehman Bros., Inc. v. M & L Invs., 10 F.3d 1510 (10th Cir. 1993).  "[I]n Oklahoma, the established choice of law rule in contract actions known as *lex loci contractus* is that, unless the contract terms provide otherwise, the nature,

---

[5]  Because the Court determines that Plaintiffs were not covered, it does not address arguments related to the bad faith claim.

validity, and interpretation of a contract are governed by the law where the contract was

made." Harvell v. Goodyear Tire & Rubber Co., 2006 OK 24, ¶ 14, 164 P.3d 1028, 1033-34

(footnotes omitted); see also Been v. O.K. Indus., Inc., 495 F.3d 1217, 1236 (10th Cir. 2007).

> Because conflicts of law are inevitable in a federal system, parties to a
> contract are empowered to and frequently do choose a particular state's law to
> apply to the execution and interpretation of the contract.  Absent special
> circumstances, courts usually honor the parties' choice of law because two
> "prime objectives" of contract law are "to protect the justified expectations of
> the parties and to make it possible for them to foretell with accuracy what will
> be their rights and liabilities under the contract."

Boyd Rosene & Assocs., Inc. v. Kan. Mun. Gas Agency, 174 F.3d 1115, 1121 (10th Cir.

1999) (citations omitted).

Recreation Inc.'s policy contains the following "Governing Law" provision: "This

Agreement is entered into in the State of Utah and the Agreement, and any rights, remedies,

or obligations provided for in this Agreement, shall be construed and enforced in accordance

with the laws of Utah."  (Recreation Inc. Policy at 21.)

Plaintiffs challenge the application of this provision by arguing that the binder, or

temporary contract of insurance, that was in effect at the time of Bray's death did not state

that Utah law would govern.  (See Pls.' Mot. at 9.)  Such a contention is without merit.

When Betty Rutz completed and returned the receipt form on July 29, she accepted the offer

of insurance being extended.  The policy had a retroactive effective date of June 25.  The

binder was only effective until the policy issued.  See, e.g., Phoenix Indem. Ins. Co. v. Bell,

896 P.2d 32, 36 (Utah Ct. App. 1995).  Thus, Plaintiffs' alleged right to defense/indemnity

arose, if at all, under the policy issued and not the binder.

Furthermore, the choice-of-law provision would apply even if the policy had not issued.

> Clearly, the legal rights and duties of the contracting parties that are not covered by the provisions of the binder, or otherwise, must be determined by an inspection of the terms of the written policy which the parties expected would be issued. Reference will be made to the terms and provisions of the formal policy scheduled to be issued to the applicant, or to the ordinary and customary type of policy normally issued by that insurer under the particular type of application, even though that policy may never issue, unless the parties expressly agreed to other terms when the binder was issued, so that applying the terms of the typical policy used by the insurer to cover this risk would be inconsistent with the parties' agreement.

16 Richard A. Lord, <u>Williston on Contracts</u> § 49:53 (4th ed. 2007) (footnotes omitted); <u>see also</u> 44 C.J.S. <u>Insurance</u> § 423 (2008).

In this case, the binder (i.e., the Liability Coverage Quotation) did not recite the Association Underwriter's right and duty to provide a defense with respect to covered claims, nor did it contain a choice-of-law provision. Had the policy not issued, resort would still have to be made to the terms and provisions of the policy, including the express agreement to apply Utah law to the rights, remedies, and obligations provided. There is no suggestion by Plaintiffs that the parties expressly agreed that another state's laws would apply or that Recreation Inc.'s prior policies lacked such provisions or specified that different law would govern. Therefore, the choice-of-law provision applies to policy construction and enforcement questions.

### B.     Issue Preclusion

Although both sides agree that the Kay County judgment is binding, brief mention is warranted given its importance to the claims raised here.   The Court must afford an Oklahoma judgment the preclusive effect it is given under Oklahoma law.  28 U.S.C. § 1738 (providing full faith and credit to state court judgments); Stifel, Nicolaus & Co. v. Woolsey & Co., 81 F.3d 1540, 1544 (10th Cir. 1996).  Oklahoma follows the Restatement (Second) of Judgments § 27 (1982) in that:

> Under the doctrine of issue preclusion, once a court has decided an issue of fact or of law necessary to its judgment, the same parties or their privies *may not relitigate that issue* in a suit brought upon a different claim.  The purpose of issue preclusion is to "relieve the parties of the cost and vexation of multiple lawsuits, conserve judicial resources, and by preventing inconsistent decisions, encourage reliance on adjudication."

Miller v. Miller, 1998 OK 24, ¶ 25, 956 P.2d 887, 897 (footnotes omitted).

The Kay County District court "found" and "concluded" that the water park sale closed and became final on June 29.  The question of when and whether the sale closed was squarely before the Oklahoma court, and it answered those questions, as necessary to its judgment.  The Behars and L.L.C. were actual parties to that suit and presented evidence, through counsel, at a bench trial.  Because the fact and date of closing have already been litigated and judicially determined, the doctrine of issue preclusion prevents relitigation of those facts in this case.

### C.   Coverage

Plaintiffs advance two arguments to show that they were entitled to coverage under Recreation Inc.'s policy.  The first is that the policy was assigned to them and/or L.L.C.  The second is that they qualify as "participating members" under the policy because they were "employees" or a "real estate manager."   Neither argument is persuasive.

### (1).   Assignment

Recreation Inc.'s commercial liability policy states that it is "non-assignable": "The interest of the Participating Member [(Recreation Inc.)] under this Coverage Contract cannot be assigned without the prior written consent of the Insurer."   (Recreation Inc.'s Policy at 15.)  An anti-assignment provision in an insurance contract is valid and enforceable.  See Lee R. Russ, Couch on Insurance § 35:1 (3d ed. 2007).

Again, the Court concludes that the non-assignment provision applies even though the underlying event that would give rise to a claim, i.e., A.J. Bray's death, occurred while a temporary binder was in effect.  As explained above, Recreation Inc.'s policy issued on July 29, with a retroactive effective date of June 25.  Once the policy issued, it superceded the temporary insurance contract.  And even if a claim (or a demand for defense/indemnification because of a claim) had been made under the binder, the anti-assignment provision would still apply, absent evidence of a prior agreement to allow assignment without written consent. See 1 Allan D. Windt, Insurance Claims and Disputes § 6:36 (5th ed. 2008) ("In the event a claim arises before the actual policy is issued, the general rule is that the binder provides

only as much coverage as the policy would have provided; one who accepts a binder accepts all of the terms of the underlying insurance contract.").

In their briefs, both sides refer to the general rule that non-assignment clauses only apply before a loss is suffered.  In sum:

> Although there is some authority to the contrary, the great majority of courts adhere to the rule that general stipulations in policies prohibiting assignments thereof except with the consent of the insurer apply only to assignments before loss, and do not prevent an assignment after loss, for the obvious reason that the clause by its own terms ordinarily prohibits merely the assignment of the policy, as distinguished from a claim arising thereunder, and the assignment before loss involves a transfer of a contractual relationship while the assignment after loss is the transfer of a right to a money claim.  The purpose of a no assignment clause is to protect the insurer from increased liability, and after events giving rise to the insurer's liability have occurred, the insurer's risk cannot be increased by a change in the insured's identity.

Lee R. Russ, Couch on Insurance § 35:7 (3d ed. 2007) (footnotes omitted).

In this case, there was no assignment of right under the policy *after* the loss occurred. There is actually no indication of any express assignment between Recreation Inc. and the Behars or L.L.C. with respect to the former's commercial liability insurance policy. However, there is considerable evidence that the Rutzes and the Behars intended that the policy would transfer to the L.L.C. at closing, when the Recreation Inc.'s insurable interest (at least for purposes of commercial liability) would have terminated, see Lumbermens Mut. Ins. Co. v. Edmister, 412 F.2d 351, 354 (8th Cir. 1969) (ruling that former property owner had no insurable interest for purposes of fire insurance policy); Utah Stat. § 31A-21-104(1)(c) (defining "'insurable interest' in property or liability [to] mean[] any lawful and substantial economic interest in the nonoccurence of the event insured against.").  Because

the closing occurred on June 29, the Court finds that any assignment as between the parties to the transaction occurred at that time.

Contrary to Plaintiffs' insistence, it does not matter that on June 29 what was transferred was coverage under a binder. Recreation Inc. was transferring or assigning its contractual relationship with its insurer to another entity with different managing members. That temporary insurance contract later merged into the policy itself. Thus, the transfer occurred before the underlying loss, i.e., A.J. Bray's death, on July 14. According to the policy terms, any assignment of Recreation Inc.'s interests under the policy was ineffective absent the insurer's prior written consent. There is no evidence or suggestion that either the Rutzes or the Behars ever requested the insurer's consent.

Nevertheless, Plaintiffs contend that Recreation Inc.'s insurer waived compliance with the non-assignment provision or should be estopped from relying on that provision because of its conduct. The evidence does not support either defense.

Waiver by an insurer requires the intentional relinquishment of a known right, either expressly or because its course of conduct demonstrates such intent. Cont'l Ins. Co. v. Kingston, 2005 UT App 233, ¶¶ 9-10, 114 P.3d 1158, 1161; see also Springfield Fire & Marine Ins. Co. v. E. B. Cockrell Holding Co., 1917 OK 600, 169 P. 1060, 1064 (finding waiver of forfeiture due to agent's recognition of policy's continued existence).

Plaintiffs premise their waiver argument on ISERA's acceptance of a premium check from Ron Behar on a Sun 'N Fun account in early August 2005 and the failure to cancel or rescind the policy after learning that ownership had transferred. However, under these

circumstances, no reasonable juror could find that either Lloyds or ISERA knowingly waived an unauthorized assignment of the policy.  On August 15, 2005, Ron Behar asserted in a fax to ISERA that the water park sale had not yet closed.  It is evident that in the months after A.J. Bray's death considerable confusion and disagreement existed among all of those involved as to the water park's ownership.  Given the inconsistent representations being made, the acceptance of a single premium payment and continuation of a policy cannot constitute waiver.

Likewise, Plaintiffs have no basis on which to assert estoppel.  Estoppel requires a material misrepresentation, reasonable reliance on that misrepresentation, and a resulting injury to the insured.  <u>Youngblood v. Auto-Owners Ins. Co.</u>, 2007 UT 28, ¶ 25, 158 P.3d 1088, 1094; <u>see also</u> <u>Atlas Life Ins. Co. v. Unger</u>, 1947 OK 23, ¶ 15-16, 177 P.2d 98, 101 (Okla. 1947).  Plaintiffs have identified no statement or action by ISERA or Lloyds on which they relied to their detriment.  Because ISERA consistently identified the non-assignment provision as a concern or ground for denying coverage and did not make any conflicting or material misrepresentations in that regard (notwithstanding the uncertain status and nature of the water park sale) and because Plaintiffs relied on nothing ISERA did or conveyed except to secure a policy for L.L.C., the estoppel defense fails as a matter of law.

### (2).    Other "Participating Members"

Finally, Plaintiffs argue that the Behars and/or L.L.C. were "Participating Members" because they were functioning as employees or real estate managers of the water park.  A

"Participating Member" is entitled to coverage under Recreation Inc.'s policy.  The policy

includes as additional "Participating Members," the following:

1.  Your employees, other than your executive officers or the managers of
    your limited liability company (if you are a limited liability company),
    but only for acts within the scope of their employment by you or while
    performing duties related to the conduct of your business. . . .
2.  Any person (other than your employee) or any organization while
    acting as your real estate manager.

(Recreation Inc.'s Policy at 9-10).

The "your" and "you" refers to Recreation Inc.  (Id. at 1.)  There is no evidence that

the Behars or L.L.C. were acting as either employees or a real estate manager on behalf of

Recreation Inc.  They may well have been performing those functions, but they were taken

on behalf of themselves and L.L.C.  Therefore, Plaintiffs are not entitled to coverage on this

ground.

## CONCLUSION

For these reasons, the Court holds that there are no claims remaining for trial.

Plaintiffs were not covered under Recreation Inc.'s insurance policy so as to be entitled to

defense or indemnification for claims arising because of the death of A.J. Bray.  Accordingly,

Plaintiffs' Motion for Partial Summary Judgment (Dkt. No. 66) is DENIED.  Defendants'

Motion for Summary Judgment (Dkt. No. 60) is GRANTED.  Judgment will issue separately.

IT IS SO ORDERED this 30th day of April, 2008.

ROBIN J. CAUTHRON
United States District Judge